IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:24-CR-62 |
| | § | Judge ALM / AGD |
| GILDA ROSENBERG (01) | § | |
| | § | |
| | § | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

## General Allegations

At all times relevant to this Information:

## The Army and Air Force Exchange Service

1.      The Army and Air Force Exchange Service ("**AAFES**") was a United States Government entity under the control and authority of the Department of Defense ("DoD"). United States Congress, in 10 U.S.C. §2481, affirmed and recognized **AAFES** as an instrumentality of the United States Government. Additionally, the United States Supreme Court had consistently held that AAFES, including its activities, offices, and individual exchanges, was an integral part of the DoD and an instrumentality of the United States Government. **AAFES** Headquarters was located in Dallas, Texas. **AAFES** maintained brick and mortar stores located on DoD installations known as either Base Exchanges ("BX") or Post Exchanges ("PX"). These stores provided retail services to military service members, veterans and their families. As a non-appropriated fund activity, **AAFES** self-funded most of its operations through the revenue of its sales of

goods and services. **AAFES'** profits were re-invested in military quality of life programs for service members and their families, to include the funding of morale, welfare, and recreation programs and facilities construction. **AAFES** stores and locations were typically host to a variety of vendors, also called concessionaires. For the right to utilize **AAFES** storefronts or locations, vendors negotiated contracts either at the local BX/PX level or by bidding on **AAFES** Headquarters contract solicitations. These contracts included the terms for a vendor concession fee, which is typically a percentage of the vendor's net sales or, depending on contract wording, gross sales, at the location.

2.     **AAFES** maintained and utilized an email server located within the Eastern District of Texas.

### The Defendants and Associated Companies

3.     Defendant Gilda Rosenberg **("ROSENBERG")** resided in or around Miami, Florida. **ROSENBERG** was the President, Owner, or Principal of Gilly USA, Inc., GBR Enterprises, Inc., Gilly Vending, Inc., GRP Automated, Inc., Gilly National, Inc., MRP Property Holding, Gilly Markets, Inc. (collectively, a.k.a. "GILLY COMPANIES," hereinafter, **"GILLY VENDING"**)

4.     Defendant Amit Biegun ("**BIEGUN**") resided in or around Aventura, Florida. **BIEGUN** was the Chief Financial Officer of **GILLY VENDING**.

5.     From January 2016 until at least November 2021**, GILLY VENDING** used an email server hosted in Pennsylvania. Thus, emails sent by **GILLY VENDING** to **AAFES** were interstate wire transmissions in and through the Eastern District of Texas.

**Background: Vending Industry, the 'R' Factor, and VMS**

6.      Vending machines belonged to a market segment known as "unattended retail." The vending machines onsite at most locations were predominantly owned and operated by outside vending companies through agreements with the onsite entity. As the primary manner of agreement for entities with large revenue potential – universities, hospital systems, and airports – vending companies entered into contractual agreements by which they are required to provide a range of vending services and products while paying commissions based upon sales volume to obtain access to these high revenue areas.  Commissions were generally a set percentage, calculated and paid monthly with accompanying reporting requirements to show actual sales, in total and by detail of individual machines.

7.      The use of telemetry-based remote machine monitoring, in conjunction with the cloud-based vending management software ("VMS"), was standard practice in the vending machine industry. Each vending machine was assigned a unique identifier, such as an asset ID, and its telemetry device not only recorded overall sales of the machine but tracked the position and movement of each individual coil position within. Thus, telemetry devices on machines and VMS allowed for automated restock signaling, optimized route management, and the real-time monitoring and analysis of sales and product performance of individual machines. Nearly all vending services companies now use some form of VMS. Sales by individual vending machines are sometimes mentioned as "machine recorded sales."

8.      Vending services professionals understood the term 'R' Factor – i.e. factor, factoring, or "reduction" factor.  Although sometimes shorthand for allowable deductions, such as sales tax and credit card fees, use of an 'R' factor also could mean that a vending company underreported actual sales to its client(s) by a certain percentage, primarily for the purpose of avoiding paying higher commission fee totals on commission-based contracts. For example, an 'R' Factor of .75 or 75% on actual sales of $100,000 equaled only $75,000 reported to the client and, therefore, a corresponding percentage decrease in total commission paid. At no time was **AAFES** aware of Defendants' use of a 'R' factor in their reported sales data.

9.      Subcontracting with other vending companies within the industry was a common occurrence. Due to the regional focus of many vending companies, when national-level bids were won by a company outside the geographic area, it was common for the awardee company to execute a subcontractor operator agreement with a regionally focused and available vending company to fulfill the contract. A subcontractor operator agreement included a sales-based commission fee from the subcontractor to the awardee company. Subcontractor operators were generally responsible for purchase of inventory, state sales tax collection/remittance and their own operating costs. In all instances concerning **AAFES** in this Information, **GILLY VENDING** subcontracted with other vending companies to execute the servicing of its contracts. Thus, **GILLY VENDING**'s profitability was directly tied to the margin of its subcontractor commission fee versus its **AAFES**/client commission fee.

10.     Because of the vending services industry's common knowledge of the 'R' factor, vending companies and their vending subcontractors sometimes created 'commission user' accounts in VMS where actual, real-time sales data could be viewed by all parties in an effort to promote transparency.

### AAFES Vending Contracts and GILLY VENDING Awards

11.     **AAFES** vending services contracts were generally awarded in the following manner: A solicitation was issued by AAFES Headquarters out of Dallas; vending companies responded with "bids" or proposals; and, AAFES evaluated and selected the best proposal based upon several factors, but primarily upon revenue potential. All **AAFES** vending services contracts required the vendor (also, "concessionaire") to pay a commission fee (also, "fee schedule") based on either gross sales or net sales. **AAFES** contracts issued after 2019 were commission based upon net sales and allowable deductions were specified in detail within the contract.

12.     As part of their bid proposals, **GILLY VENDING** submitted its combined financial statements for "GILLY COMPANIES" while representing itself as a single entity: Gilly Vending, Inc. or Gilly National, Inc.

13.     Most **AAFES** vending services contracts issued from **AAFES** Headquarters used a standard template and contained the same provisions, special provisions, and terms and conditions unless otherwise negotiated and documented. They required a provision for vending companies to report their total sales and commission figures in a standard template known as a "Concessionaire Settlement Report" ("**Settlement Report**") along with the corresponding individual machine-recorded sales detail.  This documentation

**Information – Page 5**

was due, along with commission check payment, to individual **AAFES** contract locations generally by the 15th of each month for the preceding month's sales.

14.    Since the first contract in 2016, **AAFES** has awarded **GILLY VENDING** over twenty contracts for full line vending services, snack contracts, beverage contracts, and micro-markets.  Depending on the size of locations and contract type, these individually generate anywhere from $24,000 to $1,000,000 in yearly sales.

## COUNT 1

Violation:  18 U.S.C. § 1349
(Conspiracy to Commit Wire
Fraud in violation of 18 U.S.C. §
1343)

From in or around May 2016, and continuing thereafter until at least January 2023, the exact dates being unknown to the United States Attorney, in the Eastern District of Texas, and elsewhere, the defendants, **BIEGUN and ROSENBERG**, did intentionally, knowingly, and willfully combine, conspire, and agree with each other and others, both known and unknown to the United States Attorney, to devise a scheme and artifice to defraud, and obtain money and property from **AAFES** by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce, any writings, signs, signals, and sounds, in violation of 18 U.S.C. § 1343; and

## Object of the Conspiracy

15.     It was the object of the conspiracy to defraud AAFES by creating and presenting materially false **Settlement Reports** and false claims in order to avoid fully paying contractually required commissions.

## Manner and Means of the Conspiracy

Among the manner and means by which **ROSENBERG** and **BIEGUN** carried out the conspiracy were the following:

16.     Defendants conducted financial analysis of awarded **AAFES** contracts to determine the necessary 'R' factor needed to be profitable and in-turn, defraud **AAFES**.

17.     Defendants systematically monitored its subcontractors' actual sales data using cloud-based VMS commission user access.

18.     Defendants restricted communication between **AAFES** representatives and sub-contractors concerning actual sales information in instances where **GILLY VENDING** operations team members or subcontractors might inadvertently expose the scheme.

19.     Defendants emailed employees and contract employees spreadsheet templates and other directives which contained the processes for 'R' factoring to be used to create false sales reports in furtherance of the conspiracy.

20.     Defendants would receive accurate sales data from their sub-contractors and would then fraudulently reduce that number by the pre-determined 'R' factor.

21.     After determining the new, fraudulent sales figures, Defendants would create false **Settlement Reports**.

Information – Page 7

22.     Defendants would either mail or email the false monthly **Settlement Reports** and/or false corresponding sales data to **AAFES.**

23.     Additionally, prior to September 2022, the defendants used commercial interstate carriers and U.S. Postal Service to mail commission checks, materially false sales reports and falsified documentation to various **AAFES** contract locations throughout the country. After September 2022, the defendants electronically transferred the payments to **AAFES.**

24.     The known fraud loss to **AAFES** during the term of the conspiracy at the time of the filing of this Information is more than $550,000.00. This amount was after the defendants entered the conspiracy, part of jointly undertaken activity and reasonably foreseeable to them.

### Overt Acts

In furtherance of the conspiracy and to affect the objects thereof, the following overt acts, among others, were committed by the defendants in the Eastern District of Texas and elsewhere:

25.     **Fort Polk Award and Underreporting:** On July 29, 2021, AAFES awarded a secondary beverage contract, PLK 21-13694B, to **GILLY VENDING** based upon its initial bid proposal submitted July 15, 2021. The contract fee schedule for commission was 33% on net sales.

   a.  From August 6, 2021 through August 7, 2021, **ROSENBERG** communicated via email with **BIEGUN,** regarding the Fort Polk award.

b.  **ROSENBERG** stated "we have the factor to play with" and that "we are paying "33%". **ROSENBERG** suggested using a "factor on sales" to avoid both taking a loss on the contract and potentially breaching contract if unable to negotiate a favorable subcontractor commission.

c.  On August 17, 2021, **BIEGUN** sent an email to **ROSENBERG** which showed the profitability analysis regarding Fort Polk. The email was titled with the subject "Fort Polk Coke – Amit's Analysis – CONFIDENTIAL." The contents of the email include an embedded photo of **BIEGUN**'s profitability analysis with a section that reads "Gilly Reporting to Ft. Polk Factor .90"; the text of his email also states that "We can make $17k/year using at (sic) 0.90 factor."

d.  On or about November 15, 2021, **BIEGUN** sent an email, which was processed through the AAFES email server in the Eastern District of Texas, with materially false sales information to two AAFES Fort Polk Services employees.

e.  All machine recorded sales and the total amount reported by **BIEGUN** were 'R' factored by 93 percent: **GILLY VENDING** Reported Net Sales – $67,732.17; Actual Net Sales Reported to **GILLY VENDING** by its subcontractor – $72,830.29; resulting AAFES commission fee loss – $1,682.38.

26.    **Fort Gordon: Emailing False Claims to AAFES Employee C.R.:** On or about September 13, 2016, **BIEGUN** sent an email with materially false sales

information to AAFES employee C.R., Fort Gordon Vending Operations Assistant, for

the previous month's sales. This began a long-standing practice where settlement reports

and sales data were emailed to AAFES Employee C.R. with materially false sales figures.

27.    **Fort Gordon – Emails to Prevent the Revelation of Actual Sales Data:**

On October 28, 2021, **BIEGUN** and **ROSENBERG** attempted to prevent, through the

use of email and phone communication, the revelation of actual sales information.

- a. On this date, AAFES Employee C.R. sent an email to several **GILLY VENDING** employees and subcontractors regarding a high volume of service calls in the last three months at Fort Gordon.  Within AAFES Employee C.R.'s email, she cites the number of service calls and notes the discrepancies between the previous year's sales to the corresponding current year sales.

- b. **ROSENBERG,** using <gillyteam@gillyvending.com> and forwarding the email to **BIEGUN,** wrote "Problem."

- c. **ROSENBERG** responded to the C.R.'s email: "Good Morning Carla, Pls help me recall this message. Only Amit and I should receive anything to do with private corporate financials. We do Not (sic) share any private informations (sic) with our service teams and this has never happened before…please help us get this corrected."

- d. Simultaneously, **BIEGUN** responded to C.R.'s email: "Please Recall this email. We do not share sales/financial private information with our

operational and service team. Only Gilda and Amit from Gilly Vending can receive financial information."

e. **BIEGUN** also called C.R. to give the same admonishment verbally.

All in violation of 18 U.S.C. § 1349.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

### Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461

As the result of committing the offenses alleged in this Indictment, the defendants shall forfeit to the United States:

Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense, including, but not limited to, the following:

### Cash Proceeds

A money judgment equal to $1,625,829.66 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offenses alleged in this Indictment.

### Substitute Assets

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants-

Information – Page 11

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with a third person;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property, including but not limited to all property, both real and personal owned by the defendants.

By virtue of the commission of the offenses alleged in this Indictment, any and all interest the defendants have in the above-described property is vested in and forfeited to the United States.

Date: _7-26-24_

Respectfully Submitted,

DAMIEN M. DIGGS
UNITED STATES ATTORNEY

MATTHEW T. JOHNSON
Assistant United States Attorney

Information – Page 12